Tenney **ROSS**
v.
**UNITED STATES.**
No. 93–57.

United States Court of Claims.
June 3, 1959.

---

794

Robert Holt Myers, Washington, D. C., for plaintiff. John H. Myers, Frederick M. Bradley, Paul F. Myers and Williams, Myers & Quiggle, Washington, D. C., were on the brief.

John A. Rees, Washington, D. C., with whom was Asst. Atty. Gen. Charles K. Rice, for defendant. James P. Garland and Lyle M. Turner, Washington, D. C., were on the brief.

JONES, Chief Judge.

Plaintiff sues for refund of income taxes paid on an amount which the taxing authorities treated as a dividend, and which he claims should have been treated as long-term capital gain.

In 1954 plaintiff owned 450 shares of capital stock in the Washington Loan and Trust Company of Washington, D. C., hereinafter referred to as the "Trust Company", a banking corporation organized under the laws of the District of Columbia. The Riggs National Bank of Washington, D. C., hereinafter referred to as the "Riggs Bank", is a national banking association organized under the banking laws of the United States.

In April of 1954 the president of the Trust Company and the president of Riggs Bank and their assistants began preliminary discussions about a possible consolidation. The negotiations were at all times carried out at arm's length and on a business basis. The president of the Trust Company requested the president of Riggs Bank to make an offer of exchange on a stock-for-stock basis, and at all times the Riggs Bank officials knew that the Trust Company desired an exchange on that basis.

The representatives of the Riggs Bank found that a stock-for-stock offer would create unreasonably small fractional shares of stock, less than one-eighth of a share. The Riggs Bank representatives decided that their offer would be in terms of stock plus cash.

As a result of the preliminary negotiations, a study of the book values of the two banking institutions was made, and in May of 1954, the comptroller of the Riggs Bank prepared a "Suggested Exchange Offer" of one share of Riggs Bank stock for eight shares of Trust Company stock, plus $3 in cash for each Trust Company share. Apparently, no action was taken on that offer.

About three months later, the Equity Corporation of New York City offered to buy all the Trust Company stock for $51.50 a share.

Shortly thereafter negotiations between the Riggs Bank and the Trust Company were resumed. The book values of the two banks were recomputed as of the date of the Equity offer, and the adjusted book value of the Riggs Bank was determined to be $392.89 a share and that of the Trust Company to be $49.08 a share. Studies indicated that a 1 for 8 exchange ratio would produce an ownership benefit of .27 percent, which would be a $75,000 ownership advantage to the Riggs Bank shareholders in the $26,000,000 assets of the consolidated bank. That would mean that the Riggs Bank would be contributing 82.49 percent of the assets and receiving 82.76 percent of the stock ownership in the combined bank. The Riggs Bank decided to make an offer of one share of Riggs Bank stock for eight shares of Trust Company stock, plus a cash payment of $4.50 a share, or $52.83, as competitive with the offer of $51.50 made by the Equity Corporation. The second Riggs Bank offer was designed to be sufficiently higher than the Equity offer to discourage a counter-offer.

When the president of the Trust Company received the second Riggs Bank offer, he again requested that a stock-for-stock offer be made. He was told that a straight stock-for-stock exchange would result in 1.09311 shares for 8 shares. The Trust Company representatives tried to convert the offer into a stock-for-stock offer, but the fractional share would be something more than $\frac{5}{64}$ of a share and something less than $\frac{3}{32}$ of a share in the consolidated bank. The president of the Trust Company, unable to persuade the Riggs Bank to make such an offer, agreed to recommend to his board of directors that the second Riggs Bank offer be accepted.

The directors of the Riggs Bank and the directors of the Trust Company entered into an "Agreement of Consolidation" on the basis of the second Riggs Bank offer. This consolidation was effected pursuant to the provisions of section 3 of the National Banking Act of November 7, 1918, 40 Stat. 1043, as added by 44 Stat. 1224, and amended by 48 Stat. 162, 12 U.S.C.A. § 34a.[1]

1. "That any bank incorporated under the laws of any State, or any bank incorporated in the District of Columbia, may be consolidated with a national banking association located in the same State, county, city, town, or village under the charter of such national banking association on such terms and conditions as may be lawfully agreed upon by a majority of the board of directors of each association or bank proposing to consolidate, and which agreement shall be ratified and confirmed by the affirmative vote of the shareholders of each such association or bank owning at least two-thirds of its capital stock outstanding, * * *. Upon such a consolidation, * * *, the corporate existence of each of the con-

The necessary ratification and confirmation by the shareholders of each of the banking institutions, and the approval of the Comptroller of the Currency were obtained. The consolidation became effective at the close of business on October 1, 1954.

As of the close of business on October 1, 1954, the Trust Company had earnings and profits of $909,671.49. Prior to the close of business on that same day, the Riggs Bank withdrew from its earnings and profits $450,000, which was set aside in a trust fund in the Riggs Bank trust department, to be used to pay the $4.50 per Trust Company share, as provided under the terms of the Agreement of Consolidation. The assets of the consolidated bank did not include the $450,000 withdrawn by the Riggs Bank, but did include all of the other assets of both banks.

Plaintiff exchanged his 450 shares of Trust Company stock for 56 shares of the consolidated bank and $2,025 in cash.

It is plaintiff's position that the $2,025 is capital gain within the purview of § 356(a) (1) (B) of the Internal Revenue Code of 1954.[2]

The Government says that the cash received by plaintiff is either an ordinary dividend within the meaning of § 316 of the 1954 Code, 26 U.S.C. § 316, or "has the effect of the distribution of a dividend" within the meaning of § 356(a) (2).[3]

The cash received by plaintiff was not physically paid to him by the Trust Company out of its earnings and profits, and, in a technical sense, cannot be an ordinary dividend as defined in § 316.

The issue here is a close one. There is no question of the good faith of both parties to the consolidation. The question here, however, is the wording and interpretation of the applicable statute. The ultimate question finally narrows down to whether the payment had the effect of a distribution of a dividend under § 356(a) (2).

stituent banks and national banking associations participating in such consolidation shall be merged into and continued in the consolidated national banking association and the consolidated association shall be deemed to be the same corporation as each of the constituent institutions. All the rights, franchises, and interests of each of such constituent banks and national banking associations in and to every species of property, real, personal, and mixed, and choses in action thereto belonging, shall be deemed to be transferred to and vested in such consolidated national banking association without any deed or other transfer; * * *."

2. What took place was not a sale, but was a consolidation with an exchange of stock and payment of cash. The consolidation was under the authority of section 3 of the National Banking Act, supra, and a consolidation pursuant thereto is not a sale. United States v. Seattle First Nat. Bank, 1944, 321 U.S. 583, 64 S.Ct. 713, 88 L.Ed. 944. Section 368 of the 1954 Code, 26 U.S.C. § 368 includes a consolidation within the definition of a "reorganization", and a reorganization such as the one in this case receives the special tax treatment provided for in § 356 (a) (1) or (2).

3. "§ 356. Receipt of additional consideration.
　"(a) Gain on exchanges.
　"(1) Recognition of gain.
　"If—
　"(A) section 354 * * * would apply to an exchange but for the fact that
　"(B) the property received in the exchange consists not only of property permitted by section 354 * * * to be received without the recognition of gain but also of other property or money,
then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.
　"(2) Treatment as dividend.
　"If an exchange is described in paragraph (1) *but has the effect of the distribution of a dividend*, then there shall be treated as a dividend to each distributee such an amount of the gain recognized under paragraph (1) as is not in excess of his ratable share of the undistributed earnings and profits of the corporation accumulated after February 28, 1913. The remainder, if any, of the gain recognized under paragraph (1) shall be treated as gain from the exchange of property." [26 U.S.C., 1952 ed., Supp. II, § 356.] [Emphasis supplied.]

The answer to that question depends on all the facts and circumstances surrounding the distribution. Idaho Power Company v. United States, Ct.Cl. 1958, 161 F.Supp. 807, certiorari denied 358 U.S. 832, 79 S.Ct. 53, 3 L.Ed.2d 70; Northup v. United States, 2 Cir., 1957, 240 F.2d 304; Smith v. United States, 1955, 130 F.Supp. 586, 131 Ct.Cl. 748; Commissioner of Internal Revenue v. Snite, 7 Cir., 1949, 177 F.2d 819; Stein v. United States, 1945, 62 F.Supp. 568, 104 Ct.Cl. 446; Rheinstrom v. Conner, 6 Cir., 1942, 125 F.2d 790, and cases cited therein.

The problem of dividend equivalence usually arises in reorganization cases under § 356 (§ 112(c) (2) of the Internal Revenue Code of 1939, 26 U.S.C. § 112(c) (2)) and in redemption cases under § 302, 26 U.S.C. § 302 (§ 115(g) of the 1939 Code, 26 U.S.C. § 115(g)). The phrase "has the effect of the distribution of a dividend" in § 356 and its predecessor is in *pari materia* with the phrase "essentially equivalent to a dividend" as used in § 302 and its predecessor. Hawkinson v. Commissioner, 2 Cir., 1956, 235 F.2d 747; Kirschenbaum v. Commissioner, 2 Cir., 1946, 155 F.2d 23, 170 A.L.R. 1389, certiorari denied 329 U.S. 726, 67 S.Ct. 75, 91 L.Ed. 628.

Plaintiff says that the indicia of dividend equivalence applied by the courts in the general area of redemptions or cancellations are not applicable to his case. Different facts are considered depending upon the nature of the transaction from which the distribution arises, but the test remains the same, that of looking to all the facts and circumstances surrounding the distribution to appraise the consequences of the transaction.

Plaintiff urges vigorously that the Government's position in this case calls for a return to the automatic dividend equivalence theory, i. e., that whenever there is a distribution of "boot" money in connection with an exchange of stock or securities, and there are earnings and profits, the "boot" money is automatically a distribution of a dividend. Commissioner of Internal Revenue v. Estate of Bedford, 1945, 325 U.S. 283, 65 S.Ct. 1157, 89 L.Ed. 1611, has frequently been relied upon as authority for the automatic dividend equivalence theory. In Idaho Power, supra, this court, after a careful consideration of the Bedford case, held that it is consistent with the rule that the question of dividend equivalence is a question of fact in each case.

We have examined all the facts and circumstances of the instant case, and we cannot escape the conclusion that the payment had the effect of the distribution of a dividend.

It makes no difference whether the $450,000 was distributed out of the earnings and profits of the Trust Company or out of such funds of the Riggs Bank set aside before consolidation. Commissioner of Internal Revenue v. Owens, 5 Cir., 1934, 69 F.2d 597; Woodward v. Commissioner, 1931, 23 B.T.A. 1258, 1259. The net result was the same. If a stock-for-stock exchange could have been worked out without long-drawn-out fractions, undoubtedly there would have been a simple exchange of shares. If the distribution had been out of the funds of the Trust Company, that company would have brought into the consolidated bank $450,000 less than it actually brought in. Since it was physically paid out of set-aside funds of the Riggs Bank, that institution brought into the consolidated bank $450,000 less than it would have contributed had the Trust Company paid out the funds before consolidation. Whichever method was used, the net assets of the consolidated bank would have been the same. The more circuitous route was taken. The result was the same. It was merely the mechanics that were different.

Because of the mechanics employed to effect the payment of the money to the Trust Company shareholders, the money was not physically paid out of earnings and profits of the Trust Company, but it was in reality funds earned and owned by the Trust Company. Had the Riggs Bank not withdrawn the $450,000 prior to consolidation, it would

have been contributing 84.09 percent of the assets of the consolidated bank rather than the 82.49 percent which it did contribute. The $450,000 distributed to the shareholders of the Trust Company represented the $75,000 imbalance of .27 percent in favor of the Riggs Bank shareholders and $375,000, i. e., .75 percent of the $50,000,000 deposits in the Trust Company, part of the "swing-in" value of certain non-book assets which the parties had agreed should be reflected in the exchange offer. Thus the $450,000 was identified as funds earned and owned by the Trust Company. They were as completely identified as was the one-eyed man who was suspected of cheating in the early days' western poker game. One of the victims finally said, "Now, I am not going to call any names, but if the man around this table who has been cheating doesn't stop, I am going to shoot out his other eye."

So it follows that regardless of who physically paid out the money, and regardless of whose name is placed on those earnings, the effect is the same as if the Trust Company had made a distribution out of funds specifically labeled "Trust Company earnings and profits."

The question is whether the declaration of a dividend by the Trust Company would have accomplished the same result as the distribution of the $450,000 by the Riggs Bank. Smith v. United States, supra; Northup v. United States, supra. In Smith, we found that the distribution of a dividend would not have accomplished the purpose of the corporation, which was the acquisition of stock to be optioned to and later purchased by a key employee, and therefore the distribution was not essentially equivalent to a dividend. Plaintiff says that the declaration of a dividend here would not have accomplished the purpose of effecting a consolidation, but neither would the payment by the Riggs Bank of the $450,000 have accomplished a consolidation, but it accomplished a step leading to the consolidation. The declaration of a dividend by the Trust Company would also have accomplished that same step, i. e., the

step of bringing the stock ownership into line with the assets contributed.

Plaintiff argues vigorously that the results of this transaction show that this distribution does not have the effect of a dividend within the test set out in the *Idaho Power* case, supra, at page 810 of 161 F.Supp.:

"An important indicium of equivalence of a payment to a dividend is present if, after the exchange of stock and the payment, the shareholder still has *the same or substantially the same interest in the corporation after the payment that he had before.* The ordinary dividend received by a shareholder does not disturb his interest in the corporation at all. He has the right, in the future, to the same fixed rate of dividend on his preferred stock, or the same share of profits, on his common stock, as he had before the dividend was paid. * * *" [Emphasis added.]

Plaintiff says that after the consolidation his status was "drastically" changed: that prior to the consolidation he owned 450 shares in the Trust Company and after the consolidation he had some 56 shares in a different corporation; that before he had an interest of $45/100$ of 1 percent in the Trust Company and after he had an interest of $9/100$ of 1 percent in the consolidated bank. However, these changes are such as are inherent in any statutory consolidation. Plaintiff has the same right to receive dividends in the future and the same right to a share of the assets upon dissolution of the consolidated bank as he would have had, if the Trust Company had declared a dividend of $4.50 a share.

We have appraised the results of the transaction here in question, and we conclude that the payment had the effect of the distribution of a dividend.

The petition will be dismissed.

It is so ordered.

BRYAN, District Judge, sitting by designation, LARAMORE, MADDEN and WHITAKER, Judges, concur.